Filed 3/29/22  In re J.P. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re J.P., a Person Coming Under the Juvenile Law. | B314310 |
| _____ | (Los Angeles County Super. Ct. No. 19CCJP06772B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| R.R., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra Archuleta, Judge.  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Senior Deputy County Counsel, for Plaintiff and Respondent.

When J.P. (Minor) was 14 months old, the juvenile court removed him from his parents' care because he was at risk of harm from domestic violence between his mother R.R. (Mother) and father J.V.P. (Father).[1]  Following termination of Mother's reunification services for noncompliance with her case plan, Mother asked the juvenile court to order a bonding study in advance of a parental rights termination hearing to make a case that the juvenile court should preserve some avenue for visitation between Mother and Minor.  We are asked to decide whether the trial court abused its discretion in denying Mother's request for a court-ordered bonding study.

## I.  BACKGROUND

### A.    *Domestic Violence Between Father and Mother*

Early one morning in October 2019, Father woke Mother up, accused her of being unfaithful, and demanded to look at her cell phone.  After Mother refused to surrender her phone and attempted to leave the home, Father grabbed Mother by the hair and pulled her back inside the apartment, tearing hair from her scalp in the process.  When Mother retreated to the bathroom, Father forced his way inside and beat Mother with the wooden handle of a plunger, fracturing one of Mother's thumbs and leaving multiple bruises on her body.  Mother was taken to a hospital where she was treated for her injuries; while being treated, Mother told the hospital staff she was a victim of domestic violence.  The following day, Father was arrested.

Mother gave a different account of her injuries to a social worker from the Los Angeles County Department of Children and

---

[1]      Father is not a party to this appeal.

Family Services (the Department). Mother conceded she and Father argued, but Mother denied the argument became physically violent. She said she sustained her injuries in a fight that occurred at a nightclub while she was out with her girlfriends. Mother did admit, however, that several months earlier (in July 2019) she argued with Father about infidelity and Father did kick and punch her. In the aftermath of that earlier altercation, Mother obtained a temporary protective order, but she elected not to seek more enduring protection after Father promised not to hit her again and asked for forgiveness.

Father admitted there had been a verbal argument in October 2019 but denied he engaged in any physical violence. Father stated that during the October incident Mother deliberately cut her wrists and threw a knife at him. As for the altercation Mother described earlier in July, Father admitted "something happen[ed]" but said he could not recall any details.

The social worker interviewed Minor's maternal grandmother, who confirmed the incidents of domestic violence in July and October 2019 and stated the fighting between Father and Mother was ongoing. The maternal grandmother opined the parents should not be together. She further advised that for the past five years she had been taking care of Minor's eight-year-old brother full-time,[2] and took care Minor for the last year when Mother was at work.

---

[2] Minor and his brother do not share the same biological father.

*B.     Dependency Petition and Jurisdiction*

The Department filed a multi-count dependency petition alleging Minor and his brother were at risk of harm due to Mother and Father's history of domestic violence, including both the July and October incidents, and Mother's mental and emotional problems. The juvenile court detained Minor from his parents, ordered monitored visitation for Mother, and placed Minor and his brother with the maternal grandparents.[3]

In advance of a scheduled jurisdiction hearing, the Department, among other things, re-interviewed Mother, the maternal grandmother, and Father. Mother continued to deny Father hit her in October. Mother also said Minor was staying with the maternal grandmother and not present during any domestic violence between her and Father that was alleged in the dependency petition. (The maternal grandmother said the same.)

When it came time for the jurisdiction hearing in December 2019, Mother pled no contest to an amended petition alleging counts under Welfare and Institutions Code section 300, subdivision (b)(1) (substantial risk of serious physical harm).[4] The juvenile court ordered Minor removed from Mother's custody and care. The court granted family reunification services to Mother, along with monitored visitation and a variety of services, including domestic violence counseling and individual counseling.

---

[3]     While awaiting completion of the Department's background check into the maternal grandparents, Minor was initially and briefly placed in a foster home and then with the maternal great-aunt.

[4]     Statutory references that follow are to the Welfare and Institutions Code.

5

At the conclusion of the hearing, the court warned Mother that, due to Minor's young age, if she chose to "blow[ ] off" her case plan, the court could "terminate family services and set the matter for [a] permanency hearing, which can include adoption, termination of parental rights, legal guardianship, a planned permanent living arrangement."

### C.    *Termination of Reunification Services*

Leading up to the six-month review hearing, the Department reported Mother was only in partial compliance with her case plan.  Among other things, Mother, despite the existence of an active restraining order, had been in contact with Father, lied to the Department's social worker about those contacts, and suffered further violence at the hands of Father.  Mother was, however, making efforts to maintain her relationship with Minor through consistent monitored in-person visits and then, after the onset of the COVID-19 pandemic, through telephone and video calls.

According to the maternal grandmother, Mother was engaged and interacted with Minor during her in-person visits and Minor often cried when those visits ended.  The Department characterized the bond between Mother and Minor as "strong." Minor was also doing well in the maternal grandparents' home, and they wanted to adopt Minor (and his brother) if Mother did not reunify with the children.[5]

---

[5]    The maternal grandparents subsequently decided that only the maternal grandmother would adopt the boys to avoid slowing the Resource Family Approval process.

6

At the six-month review hearing,[6] although it found Mother's progress with her case plan had "not been substantial," the court continued her reunification services. During the ensuing review period, the Department reported Mother was not in full compliance with her case plan and continued to have contact with Father.[7] Mother had, however, remained consistent in her visitation with Minor by attending weekly monitored visits at the maternal grandmother's home and making daily telephone calls.

At the 12-month review hearing, after finding once more that Mother's compliance with her case plan was "not substantial," the juvenile court terminated reunification services, ordered permanent placement services for Minor, and set a permanency-planning review (PPR) hearing.

During the permanency planning process, the Department reported Minor and his brother were not only comfortable in the home of the maternal grandparents, but they had formed a "strong sibling bond," were "extremely bonded" with the maternal grandparents, and shared a "strong familial bond" with the maternal uncles. Although Mother maintained a pattern of consistent visitation with her children during this period and interacted with them in an appropriate manner, the maternal grandmother observed that Minor was "no longer as attached

---

[6] The hearing, which had originally been calendared for June 2020, was continued to September 2020, due to the COVID-19 pandemic.

[7] The Department received materials, including a video, from a private investigator documenting that on one occasion Mother and Father spent at least nine hours together.

7

with [M]other as in the past" and "no longer crie[d] when [M]other le[ft]." The Department recommended that adoption by the maternal grandmother should be the permanent plan for Minor and his brother.

Six months after reunification services were termination and three weeks before the PPR hearing, Mother, pursuant to section 388, petitioned the juvenile court to reinstate reunification services as to Minor. In support of her petition, Mother submitted documentation showing she had recently completed various classes, including a domestic violence program, and continued to participate in individual counseling. Mother, however, did not attach or identify any evidence supporting her claim that the resumption of reunification services was in Minor's best interest because she and Minor "share[d] a close bond." Shortly before the PPR hearing, the juvenile court summarily denied the section 388 petition.

### D. The PPR Hearing and Mother's Request for a Bonding Study

The juvenile court held a contested PPR hearing in July 2021. Mother did not testify, but her attorney offered and the court admitted over the Department's objection the documentation Mother submitted in support of her section 388 petition. The court also admitted without objection the Department's three most recent reports.[8]

---

[8]     Those reports were as follows: an interim review report dated December 31, 2020; a section 366.26 report dated April 29, 2021; and a status review report dated June 23, 2021.

8

Mother asked the juvenile court to return Minor to her custody or, alternatively, to grant her six additional months of reunification services. Such relief was warranted, her attorney argued, because Mother enjoyed a strong bond with Minor. To support that argument, Mother's attorney relied on the fact, as reported in earlier Department reports, that Mother engaged with Minor during her visits and Minor cried at the conclusion of Mother's in-person visits. Minor's counsel opposed both requests, citing Mother's continuing relationship with Father, which posed a risk to Minor's health and well-being. Based on its "thorough[ ]" review of the case, the juvenile court declined to return Minor to Mother or to order additional reunification services.

Mother's attorney then asked the juvenile court to order a bonding study and a consortium referral to preclude the maternal grandmother from denying visitation to Mother. Mother's attorney stated: "The maternal grandmother has already limited Mother's visits, and she has indicated that she is not interested in legal guardianship. For those reasons, I think Mother is at risk of having no visits. So for those reasons, I would request . . . a parental bonding study and a consortium referral." No other reason was given for requesting the bonding study or the consortium referral. The court granted Mother's request for a consortium referral to reach a mutually acceptable agreement on visitation. The court, however, denied the request for a bonding study because, based on the Department's most recent reports, it did not appear "necessary." The court explained that, as documented in the Department's reports, "it doesn't appear the bond between [Minor] and his Mother is what it used to

9

be. . . . [A]ccording to the [interim review report, dated December 31, 2020], . . . [Minor] no longer cries when Mother leaves."

## II. DISCUSSION

Mother argues we should reverse the orders entered at the PPR hearing and remand with directions to order a bonding study, chiefly, it appears, in the hope that it would provide support for application of the parent-child relationship exception to termination of parental rights. Our review is for abuse of discretion (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1341-1342), and the juvenile court was within its rights to conclude a bonding study was not necessary. The consortium referral would suffice to resolve the question of visitation and there was sufficient information in the record before the court about the nature of the bond between Minor and Mother, as well as the bond between Minor and the prospective adoptive family— including Minor's sibling.

In the context of dependency proceedings, a bonding study is an expert opinion on the existence and nature of the relationship between a parent and a child (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084) or between siblings (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1011-1012). As a general matter, a juvenile court is not required to appoint an expert when making any factual determination unless it determines "expert evidence is or may be required." (Evid. Code, § 730.) Our Supreme Court, however, has recently noted that where the termination of parental rights is at issue, "[t]rial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*In re Caden C.* (2021) 11 Cal.5th 614, 633, fn. 4 (*Caden C.*).)

10

In this case, it was undisputed Mother and Minor shared a bond due to the constancy of Mother's visitation throughout the dependency proceedings, and that the bond had been characterized by Mother, the Department, and the maternal grandmother as "strong." While there was also evidence that the bond between Mother and Minor was not *as* strong as it had been, the juvenile court could appropriately believe that the strength of the bond between Minor and Mother was not going to be dispositive of any issue it would need to decide—and certainly not as to the visitation issue that was the sole ground argued for ordering such a study. Indeed, to the extent the court itself was anticipating future decisions it may need to make, the court would have been justified in thinking that the very young age at which Minor was initially removed from Mother (14 months old), the length of time he spent out of Mother's care (22 months at the time of the PPR hearing), and Minor's undisputed bond with both the maternal grandmother (who cared for Minor during much of the time he was at least nominally in Mother's custody) and his sibling (who in all likelihood would be adopted by the maternal grandmother) would be the truly salient facts in the dependency proceedings to follow. (See, e.g., *Caden C.*, *supra*, 11 Cal.5th at 632 [identifying "'[t]he age of the child,'" and "'the portion of the child's life spent in the parent's custody'" as important factors in determining whether a parent and child shared a beneficial relationship].)

The conclusion we draw on the facts here is not inconsistent with our Supreme Court's qualified endorsement of bonding studies in *Caden C.*, a case presenting circumstances quite different from those present here. In that case (decided two months before the PPR hearing in this case), the child was

11

significantly older: approximately nine years old at the time of the contested section 366.26 PPR hearing in his case (as compared to Minor who was not yet three at the time of the PPR hearing). (*Id.* at 626-627.) In addition, Caden had spent more than half his life in his mother's care (while Minor in this case had spent less than half of his young life living with his mother). (*Ibid.*) Moreover, Caden and Minor's respective experiences with their mothers and the foster care system were markedly different. After being removed from his mother's care, Caden bounced between his mother and various foster care parents and there was concern in Caden's case about the impact of Mother's visitation on the child. (*Id.* at 626.) Under those circumstances, our Supreme Court concluded the opinions offered by the parties' experts were "an important source of information about the psychological importance of the relationship for [Caden]." (*Id.* at 633; see also *id.* at 633, fn. 4 ["Both the trial and the appellate courts found the bonding study informative"].)

The facts here are more straightforward. Minor is bonded to Mother, but also to his maternal grandmother and his brother. The maternal grandmother has been a constant in Minor's young life and a source of stability. There is ample information in the record to consider the issue of visitation. And the parties were free to bring other evidence to bear on the parent-child relationship exception if that became an issue at a later hearing. There was no abuse of discretion in declining to order the requested bonding study here.

## DISPOSITION

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.


We concur:



RUBIN, P. J.



KIM, J.